Hazel B. McTIGHE, Appellee,

v.

NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY,
Appellant.

No. 174, Docket 22920.

United States Court of Appeals
Second Circuit.

Argued June 14, 1954.

Decided Sept. 21, 1954.

Guy M. Page, Burlington, Vt., for appellant; Guy M. Page, Jr., and Phyllis W. Page, Burlington, Vt., of counsel.

Gannett & Oakes and John G. Kristensen, Brattleboro, Vt., for appellee. James L. Oakes, Brattleboro, Vt., of counsel.

Before SWAN, MEDINA and HARLAN, Circuit Judges.

MEDINA, Circuit Judge.

We are concerned on this appeal only with questions of the validity of two clauses of separate contracts limiting the liability of the telephone company for omission to include the name of a service subscriber in its alphabetical and classified directories. These questions are presented by exceptions to refusals by the court to charge the jury that their verdict in the case of each alleged breach of contract must be limited to the amount specified in these clauses.

██ As the publication of the alphabetical directory is an essential feature of the service rendered by the telephone company, regulations and requirements relative thereto appear together with the tariffs as filed with the Vermont Public Service Commission. Upon the approval by the Public Service Commission of the rates and collateral requirements such as those affecting the publication of the alphabetical directory such rates and requirements become effective and not otherwise. The limitation of liability clause thus in effect here, on approval of the Public Service Commission, follows:

"The Telephone Company's liability arising from errors or omissions in directory listings * * * shall be limited to the amount of actual impairment to the customer's service in no event shall exceed one-half the amount of the exchange service charges for main telephones, extension telephones, and private branch exchange telephones, auxiliary lines, private branch exchange trunks, and private branch exchange switchboards involved during the period covered by the directory in which the error or omission occurs."

██ The publication of the classified directory, however, is wholly a matter of private contract and contracts relating thereto are not required to be filed with the Public Service Commission which has no jurisdiction except over matters relating to the public utility services rendered by the company and the rates relative thereto. The clause applicable to the classified directory is:

"The directory service described on the reverse side of this application is for insertion in the next directory issue and each subsequent directory issue until it is cancelled in full or in part by either party by notice in writing not less than fifteen days prior to the closing date

of the issue from which the directory service is to be removed. The applicant agrees that the company shall not be liable for errors or omissions (including total omissions) in such directory service beyond the amount paid for the item or items in which errors or omissions occur for the issue life of the directory involved. The said Company reserves the right at all times to reject or discontinue any or all advertising matter."

Notwithstanding these clauses the trial court charged that, in the event that the jury found that plaintiff's name had been negligently omitted, the damages to be assessed might exceed the amounts prescribed by the terms of the contracts.

▆▆▆▆ The instructions as given were erroneous on both counts. True it is that the courts will scrutinize with care clauses exonerating public utility companies, such as railroads, telegraph and telephone companies and others, from liability for the consequences of their own negligence, with reference to the public services rendered by them. The fact that the member of the public patronizing such public utility companies must take the contract proffered by the company or forego using the service has enabled the courts to inquire into the reasonableness of the type of clause now under discussion and by this test the clause applicable to the alphabetical directory would as a matter of contract law be considered unreasonable and unenforceable. But the principle which enables courts to strike down and condemn clauses affecting the performance by the company of its functions as a public utility is limited to the area in which the public services are rendered and has no application whatever to the domain in which the public utility may freely contract in its private capacity. The obtaining of the services of the public utility by way of transportation or communications or providing gas or electricity is quite apart from the leases, advertising contracts and a host of other miscellaneous agreements commonly made by members of the public with public utility companies. If there be some disparity in the bargaining power of the contracting parties it is no more than may be found generally to exist; and the courts follow the general rule that the parties are free to contract according to their own judgment and the reasonableness of their engagements will not be entered into.

But legislation by a state may change the law. The fixing of rates is a legislative function, and the power to fix rates and regulate matters affecting rates is commonly delegated to state administrative bodies such as Public Service Commissions. For example in Vermont the Act of 1908, Laws 1908, No. 116, gave the Vermont Public Service Commission jurisdiction over the conduct of the public telephone business together with broad powers for its effective and complete supervision. Among other things the statute requires supervised companies to file rate schedules and "as a part thereof * * * the rules and regulations that in any manner affect the tolls or rates". The alphabetical directory, "as an aid to the use of the telephone system," was under the control of the Public Service Commission and subject to the rules and regulations for directory listings. The reasonableness of these rules and regulations is determined by the Public Service Commission in the exercise of the power delegated to it by the legislature. Accordingly, the "contract" with reference to the alphabetical directory, having been sanctioned as reasonable by the Public Service Commission in the exercise of its regulatory functions, is no longer one in connection with which the courts have the power to examine into the question of reasonableness on a collateral attack. Thus, for different reasons, each of the two clauses under attack here would, by the application of sound general principles, be considered valid and enforceable.

But this diversity case is governed by the law of Vermont; and we must now

examine the course of judicial decisions in Vermont and determine whether they conform to the general pattern.

█ The Supreme Court of Vermont has recognized that "[t]he Public Service Commission is an administrative body, clothed in some respects with quasi judicial functions, * * * and having, in a sense, auxiliary or subordinate legislative powers which have been delegated to it by the General Assembly." Trybulski v. Bellows Falls Hydro-Electric Corp., 1941, 112 Vt. 1, 20 A.2d 117, 120; McFeeters v. Parker, 1943, 113 Vt. 139, 30 A.2d 300. Such a commission, in promulgating future rates, is exercising a legislative rather than a judicial function. Prentis v. Atlantic Coast Line Co., 1908, 211 U.S. 210, 29 S.Ct. 67, 69, 53 L.Ed. 150. In that case, the Supreme Court of the United States, in the course of its discussion of the distinction between legislative and judicial proceedings, stated that "[t]he establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind". And in Sayers v. Montpelier & W. R. R. R., 1916, 90 Vt. 201, 97 A. 660, 664, the Vermont Court said:

> "Argument is unnecessary to support the conclusion that primary interference of the courts with the administrative functions of a commission, like our Public Service Commission, is incompatible with the proper exercise of governmental powers. If the valid orders of the commission were open to collateral attack at the option of any party aggrieved, it would give rise to confusion and result in delay—in short, wholly defeat the purpose of the statute creating the commission. Though exercising special and limited powers, as to which nothing will be presumed in favor of their jurisdiction * * *, still, within the proper limits of the authority conferred upon them by the Legislature, their jurisdiction is exclusive

and can be reviewed only in the manner provided by the statute."

█ Appellee's argument, however, completely ignores the statutory law of Vermont relating to the regulation of public utilities, and is based primarily upon Gillis v. Western Union Tel. Co., 1889, 61 Vt. 461, 17 A. 736, 738, 4 L.R.A. 611, where the Supreme Court of Vermont held that a telegraph company could not restrict its liability "to the extent of immunity from the consequences of [its] own negligence". But the Gillis case, and Davis & Gay v. Central Vermont R. Co., 1893, 66 Vt. 290, 29 A. 313, and Sprigg's Adm'r v. Rutland R. Co., 1905, 77 Vt. 347, 60 A. 143, which followed it, were decided prior to the Vermont statute of 1908, and at a time when there was no similar legislation in force. And the course of the Vermont decisions leaves no reason to doubt that the Vermont courts would follow the general pattern of law to the effect that determinations of the Public Service Commission, approving such clauses as are now before us as reasonable limitations of liability, are within its regulatory powers and are not subject to collateral attack.

In the Sayers case, supra, the Vermont Court pointed out that the purpose and function of the Vermont Public Service Commission were analogous to those of the Interstate Commerce Commission, and that, therefore, decisions of the Supreme Court of the United States relating to the jurisdiction and power of the Interstate Commerce Commission would be helpful in determining the jurisdiction and power of the Vermont Public Service Commission. Accordingly, the views of the Supreme Court expressed in Western Union Tel. Co. v. Esteve Brothers & Co., 1921, 256 U.S. 566, 41 S.Ct. 584, 585, 65 L.Ed. 1094, and Western Union Tel. Co. v. Priester, 1928, 276 U.S. 252, 48 S.Ct. 234, 72 L.Ed. 555, would, we think, be followed by the Vermont Court.

In the Esteve case, the Supreme Court, in upholding the validity of the limitation of liability " 'for mistakes   *   *   * in transmission   *   *   * of any unrepeated message,' " contained in the tariff schedule filed by Western Union with the Interstate Commerce Commission, stated that

"The limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered.

"The act of 1910 introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because when the rate is used, dissent is without effect."

The Esteve case was cited and followed in two state cases involving omission from the telephone directory, both of which upheld the validity of the limitation of liability provision in the filed tariff. Correll v. Ohio Bell Tel. Co., 1939, 63 Ohio App. 491, 27 N.E.2d 173; Cole v. Pacific Tel. & Tel. Co., 1952, 112 Cal.App.2d 416, 246 P.2d 686. See also Wilkinson v. New England Tel. & Tel. Co., 1951, 327 Mass. 132, 97 N.E.2d 413, Riaboff v. Pacific Tel. & Tel. Co., 1940, 39 Cal.App.Supp.2d 775, 102 P.2d 465.

Although it appears that in the Esteve and Priester cases the sender of the telegram had the option to secure the company's unlimited liability by paying a higher rate for a repeated message, the Supreme Court did not base its decision on the existence of the option provision, and the holding that "[t]he limitation of liability was an inherent part of the rate" remains unaffected.

▆▆ Thus, the limitation of liability arising from "errors or omissions" as to the alphabetical directory, when sanctioned by the Vermont Public Service Commission as a part of the rate schedule, became the law of Vermont, and could not be nullified by the trial judge in his charge to the jury.

It was not disputed that the classified directory was outside appellant's duties of public service and was "a vehicle to secure advertising." The trial judge also recognized that the classified directory was not controlled by the Public Service Commission, but was "governed by the general law of contracts." Notwithstanding this, however, in his charge to the jury, the trial judge attached to the limitation of liability provision in the advertising contract the same qualification as he attached to the limitation of liability provision in the service contract.

▆▆ Here, again, the instructions were not in accord with the law as declared by the decisions of the Supreme Court of Vermont. In entering into the advertising contract, the telephone company in its private capacity contracted as to matters outside the scope of its public service functions, and was free to include in the contract a limitation of liability, as this would not operate to defeat its public purpose. Osgood v. Central Vermont R. Co., 1905, 77 Vt. 334, 60 A. 137, 70 L.R.A. 930; Manchester Marble Co. v. Rutland R. Co., 1927, 100 Vt. 232, 136 A. 394, 51 A.L.R. 628. The Gillis case, relied on by appellee, does

not apply, as the contract there involved related solely to the telegraph company's public service function.

Accordingly, there must be a new trial.

Reversed and remanded.